Gerry BALLINGER, Plaintiff,

v.

Robert C. ATKINS, M.D.,
et al., Defendants.

Civil Action No. 96–563–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 16, 1996.

William C. Lane, Masselli & Lane, Arlington, VA, for Plaintiff.

J.P. Garnier, Falls Church, VA, for Robert C. Atkins, MD., PC, The Atkins Center for Complementary Medicine.

Michael W. Robinson, Venable, Baetjer & Howard, LLP, McLean, VA, for The Nutra-Sweet Company.

### ORDER

CACHERIS, Chief Judge.

For the reasons stated in the attached Memorandum Opinion, it is hereby **OR-DERED** that:

(1) NutraSweet's Motion in Limine to exclude all expert testimony from Dr. Barry Sears is **GRANTED;** and

(2) NutraSweet's Motion in Limine to exclude expert testimony from Dr. James

Brodsky concerning Plaintiff Ballinger's injuries or causation is hereby **GRANTED.**

The Clerk of the Court is directed to furnish a copy of this Order and attached Memorandum Opinion to counsel for each party.

### MEMORANDUM OPINION

This matter is before the Court on Motions in Limine filed by Defendant The NutraSweet Company, Inc. ("NutraSweet") requesting that the expert testimony of both Barry D. Sears, Ph.D. ("Sears"), and Dr. James H. Brodsky, M.D. ("Brodsky") be excluded. For reasons set forth below, both motions are GRANTED.

### I.

On April 30, 1996, Plaintiff Gerry Ballinger ("Ballinger") filed this products liability complaint against Defendants Robert Atkins, M.D. ("Atkins"), the Atkins Center for Complementary Medicine ("Center"), the Cosmetic Research Development Corporation [1], and NutraSweet. Ballinger avers that he suffered a series of chronic hypoglycemic-type symptoms as a result of ingesting NutraSweet in connection with the "Atkins Diet Program" ("Diet"), a ketogenic diet developed and marketed by Dr. Atkins, which focuses on high-protein, low-carbohydrate intake.

Ballinger alleges that after beginning the Diet in April of 1994, he ingested artificial sweeteners (notably aspartame), mostly in packet form, with puddings, desserts and in liquids such as Crystal Light. Ballinger contends that commencing in May of 1994, he suffered neurological and physical ailments, including tachycardia, dizziness, anxiety, panic attacks, blurred vision, inability to concentrate, loss of memory, and shooting pains in his left arm. On June 2, 1994, Ballinger visited a physician who advised him to cease ingesting NutraSweet. After communicating with The NutraSweet Company, Ballinger continued his use of the product, but stopped doing so after speaking with Dr. Atkins. Ballinger contends that his acute symptoms waned after discontinuing both the Diet and his use of NutraSweet, but that he has continued to suffer long-term effects, notably the inability to concentrate.

In order to establish his case, Ballinger seeks to rely on expert testimony from Sears and Brodsky. NutraSweet asserts that Dr. Sears should be precluded from testifying as an expert on any issue at all, and that Dr. Brodsky should not be permitted to testify as to any neurological injuries suffered by Ballinger, and should not be able to provide an opinion as to the causation of such alleged injuries.[2]

### II.

This Motion is brought pursuant to Rule 702 of the Federal Rules of Evidence ("Rule 702"), which governs the admissibility of expert witness testimony. The Court serves a "gatekeeper" role with such testimony, as dictated by the principles announced in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert*, by its own terms, represented a liberalization of the rules governing the admission of expert testimony. *Cavallo v. Star Enter.*, 100 F.3d 1150, 1158–59 (4th Cir.1996). According to *Daubert*, the Court must assess both "whether the reasoning or methodology underlying the [proposed] testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts at issue." *Id.* at 592–93, 113 S.Ct. at 2796. The Court's analysis should be a flexible one, with a focus "solely on principles and methodology" upon which the proposed expert testimony rests. *Id.* at 595, 113 S.Ct. at 2797.

Though the Supreme Court expressly refrained from establishing a specific test, it provided a number of considerations for courts to examine: (1) whether, and to what degree, the proposed testimony has been

---

**1.** The parties filed an Agreed Order on October 29, 1996 dismissing Cosmetic Research Development Corp. from this suit.

**2.** Ballinger contended in his written submissions to the Court that he needed more discovery to provide to his experts. At oral argument, counsel for Ballinger abandoned that argument, indicating that his experts had sufficient information at the time their depositions were taken.

tested; (2) whether the methodology or reasoning has been published or otherwise exposed to peer review; (3) the known or potential rate of error; and (4) whether it is generally accepted within the relevant scientific community. *Id.* at 591–595, 113 S.Ct. at 2796–97. The fourth factor, general acceptance, is a carryover from an earlier standard for admissibility. *See Frye v. United States,* 293 F. 1013 (D.C.1923). In recently applying *Daubert,* the Fourth Circuit apparently added a fifth factor for analysis: whether standards or controls exist over the implementation of the methodology or reasoning. *Cavallo,* 100 F.3d at 1158–59.

With these principles in mind, the Court will now evaluate the proposed testimony of Drs. Sears and Brodsky.

### III.

Barry Sears is a biochemist specializing in cardiovascular issues, and his research interests are dietary modulation, hormonal responses, and eicosanoid synthesis. He·has a Ph.D. and received postdoctoral training in biochemistry.

 As an initial matter, the Court finds it difficult to hold that Dr. Sears's background and knowledge qualify him to testify as an expert as to any issue in this case. He is not a medical doctor, is not licensed to practice medicine in any jurisdiction, and is not a member of any scientific or medical associations or societies. Sears Dep. at 13, 60. In addition, Dr. Sears has never conducted research in neurology or brain disorders, has never written specifically about either, and has never spoken to a professional body about brain disorders. Sears Dep. at 13–15. Importantly, when asked whether he has *"any* special background or expertise in the field of artificial sweeteners," Dr. Sears admitted, "No, I do not." Sears Dep. at 83 (emphasis added).

 Putting that aside, the Court will examine Sears' proposed testimony according to the *Daubert* standards. Ballinger offered Dr. Sears as an expert who would testify how aspartame could cause neurological injury. Sears' specific opinion is that

the combination of a ketogenic diet with consumption of large amounts of Nutra-Sweet contributed to significant and permanent neurological damage [suffered by Ballinger] caused by an inability of the brain to remove excessive levels of aspartic acid.

Sears Dep. at 60–61.

Dr. Sears describes his opinion as a "working hypothesis." Sears Dep. at 96, 119, 121, 130–33. In doing so, Sears falls woefully short of expressing an opinion to any degree of reasonable certainty. His opinion is merely that the combination of NutraSweet and a ketogenic diet "can *possibly* be unsafe," and he·cannot state, or even estimate, at what level of consumption such unsafe effects can arise. Sears Dep. at 134–35 (emphasis added). Sears admits that his opinion has not been confirmed or even tested by any controlled study, and that his conclusion rests solely "[o]n *one* data point ... [p]lus *speculation* about what might be out there." Sears Dep. at 226 (emphasis added). Sears admits that a study based on one data point "would be bad science." *Id.* Sears does not even know that single data point very well; he admitted to not knowing how much aspartame Ballinger had consumed. Sears Dep. at 65.

On the issue of peer review, Dr. Sears concluded that his reasoning and methodology in this case could not be submitted for publication in a scientific or medical journal "because there is not sufficient scientific basis." Sears Dep. at 225. He admits that "[t]here is no data in the literature. There is no study ever done on human beings on a ketogenic diet as to their tolerance of aspartame." Sears Dep. at 66. Dr. Sears further testified that he knows of no study which concludes that NutraSweet is "unsafe when ingested as part of a low carbohydrate diet." Sears Dep. at 83. In addition, Sears admits he "has not discussed [Ballinger's alleged ailments] with any medical doctor." Sears Dep. at 129.

Sears has failed to present any known or potential error rate; this likely follows from the fact that his reasoning has never been tested. In terms of "general acceptance," Dr. Sears flatly agrees that his "working

hypothesis" is not "well accepted" in any scientific or medical field. Sears Dep. at 145. In fact, Sears can only identify three individuals who subscribe to his "working hypothesis." *Id.* One of those people, Dr. Atkins, is a Defendant in this lawsuit, and another, Dr. Russell Blaylock, has been a guest on Atkins' radio show. *Id.;* Sears' Report at 9 (NutraSweet Ex. D).

The Court feels compelled to mention that Dr. Sears admits that as recently as 1995 he "did not have the opinion that NutraSweet was unsafe for anyone." Sears Dep. at 69. Since that time, he has not conducted any studies of his own, nor had he read any other clinical study prior to reading two items of medical literature which he obtained "around August of this year [1996]." Sears Dep. at 72. Not coincidentally, Ballinger had filed this lawsuit several months prior to that. Sears admits that he formed his opinion "for the purpose of preparing [his] report and testifying in this case." Sears Dep. at 94.

The Court has little problem concluding that the proposed testimony of Dr. Sears should be excluded. His opinion is, in his own words, a "working hypothesis" based on "one data point ... [p]lus speculation." That admission alone would support exclusion of the testimony.

In addition, neither the methodology nor the reasoning employed by Dr. Sears has been tested at all, let alone adequately tested. Neither his methodology nor his reasoning has been subject to any public peer review or publication; he has not presented any known or potential rate of error of his method; and he has failed to demonstrate any acceptance within any relevant scientific community.

Under Rule 702, the Court rules that while the evidence to which Dr. Sears would testify is relevant, it is wholly unreliable. Accordingly, the Court sustains the motion in limine as to Dr. Sears.

## IV.

Dr. Brodsky is an internist, board-certified in internal medicine. Brodsky Dep. at 15. If permitted, Dr. Brodsky would testify that Ballinger suffered neurological injury. Dr. Brodsky would also testify that the injuries Ballinger suffered were caused by consuming NutraSweet in conjunction with the Diet.

■ The Court will first examine the proposed testimony concerning injury. Dr. Brodsky opines that Ballinger suffered brain damage, with symptoms of episodical difficulty with concentration and memory, confusion, anxiety, panic, related to organic brain dysfunction. Brodsky Dep. at 65. He agrees, however, that there exist reasons other than brain damage why Ballinger may have reported having memory problems. He includes among these other possible causes sugar intolerance, latent hypoglycemia, psychiatric disorder, bowel disorder, or even an intestinal parasite. Brodsky Dep. at 38–41. Importantly, Dr. Brodsky was unable to present an opinion "with a reasonable degree of certainty." Furthermore, when asked why he had not documented that Ballinger suffers from a loss of concentration or memory due to neurological disorder, Dr. Brodsky stated, "I don't think that it's been fairly established." Brodsky Dep. at 28. Dr. Brodsky testified that none of the tests administered to Ballinger demonstrates to Dr. Brodsky that Ballinger has suffered brain damage. Brodsky Dep. at 64–65. In response to a deposition question, Dr. Brodsky stated:

I think if you asked me the question "Do you have strong evidence that this individual [Ballinger] has suffered neurological damage for whatever reason?" I would tell you that I don't have that information.

Brodsky Dep. at 50.

Finally, when asked whether Ballinger continues to suffer brain damage, Brodsky admitted "I don't know." Brodsky Dep. at 149.

Ballinger hopes to have Dr. Brodsky testify as to the existence of Ballinger's alleged injuries. Dr. Brodsky, though, essentially admitted in his deposition that he did not have a sufficient basis upon which to render such an opinion. Based on his own pre-trial statements, the Court believes that Dr. Brodsky lacks a sufficient basis to render such an opinion in the courtroom as well.

■ The Court will now assess the proposed testimony concerning causation. As

best as this Court can determine, Dr. Brodsky never made a specific causation finding in the medical records, i.e. that due to a neurological disorder, Ballinger suffered a loss of concentration and memory. In his report of September 3, 1996, Brodsky expressed his general opinion that "aspartame consumption was a significant causative factor in the health problems suffered by many of my patients."

When asked whether he ever subjected his views "to any medical peer review of any kind," Brodsky answered, "No," and then "I would agree that it is not a well-accepted view." Brodsky Dep. at 86. Brodsky further admitted to never conducting a test of his theory "with any research in the medical literature." Brodsky Dep. at 89. He stated that his opinion is based solely on "anecdotal information." Brodsky Dep. at 91–92.

Dr. Brodsky stated that he "read that some people can have adverse reactions to NutraSweet," but he is unable to recall where he read it, who authored the study, and whether it was a peer-reviewed journal. Brodsky Dep. at 18–20.

Dr. Brodsky expressed an opinion linking methanol to Ballinger's alleged injuries. He based that opinion solely on an article from the *Journal of Diabetic Association of India* which Ballinger provided him. Brodsky Dep. at 98, 100. Brodsky testified that that is not a peer-reviewed publication, and when asked whether he considered the article reliable, Brodsky replied candidly "I don't know." Brodsky Dep. at 98.

The Court notes that Dr. Brodsky also based his findings on the report generated by Dr. Sears. In reviewing that report, Brodsky did not adequately verify any of the information contained within that report. Brodsky admitted, "I didn't say I read [the references]. I looked at the citations." Brodsky Dep. at 77. When asked about Sears' view that aspartame can permanently damage the brain, Brodsky admitted, "I don't believe that it's widely accepted." Brodsky Dep. at 82. In fact, Brodsky could not name "any other person" who held Sears' view. Brodsky Dep. at 83.

The methodology and reasoning used by an expert witness should occupy a "signifi-

cant place in the discourse of experts in the field." *Cavallo,* 100 F.3d at 1159. The basis for Dr. Brodsky's opinion, as well as his methodology and reasoning, is off the radar screen of any scientific field, and certainly fails to occupy a "significant place" in accepted medicine or science. In sum, Dr. Brodsky has failed to provide scientifically reliable testimony. Accordingly, the Court grants the motion in limine as to Dr. Brodsky's testimony.

## V.

The Court recognizes that *Daubert* actually expanded the scope for admission of scientific evidence, and that cross-examination, summary judgment, and other devices should be the "conventional devices" by which a court precludes certain evidence. *Daubert,* 509 U.S. at 595–597, 113 S.Ct. at 2798. In this case, however, the testimony to be offered by these two experts fails each and every standard for admissibility annunciated by the Supreme Court and the Fourth Circuit.

In conclusion, both Motions in Limine are hereby GRANTED. Dr. Sears, Ph.D., will not be permitted to provide any expert testimony in this case, and Dr. Brodsky will be precluded from testifying as to Ballinger's injuries or causation.

An appropriate Order shall issue.