1. that Clark's motion for clarification of sentence is GRANTED.

2. that the Bureau of Corrections is directed to recalculate Clark's sentence in accordance with this opinion, awarding him good conduct credits, as appropriate, in accordance with applicable law.

William L. HIGGINS, et al.

v.

DIVERSEY CORPORATION.

No. CIV. L–95–138.

United States District Court,
D. Maryland.

April 14, 1997.

Guadalupe v. Ballentine, 32 V.I. 55 (T.Ct. St., 1994). The court noted that the purpose of the good time statute is to encourage good behavior by all prisoners. *Id. at* 60–61. However, that case did not involve a mandatory minimum sentence and is not applicable here.

Sidney G. Leech, Andrew Gendron, Baltimore, MD, Stephen W. Lutche, Bel Air, MD, for plaintiffs.

Timothy L. Mullin, Donna Burke Preston, Virginia S. Hovermill, Baltimore, MD, for defendant.

## MEMORANDUM

LEGG, District Judge.

Before this Court is a "Motion to Exclude Expert Testimony and Motion for Summary Judgment or, in the Alternative, For a Rule 104(a) Hearing," filed by defendant Diversey Corporation ("Diversey"). For the reasons stated below, this Court shall, by separate Order, GRANT defendant's motion.

## I. Background

In 1992, plaintiff William Higgins was employed as the laundry manager for Le Fountain Bleu catering company. (Opp. at 1). As part of his duties, Mr. Higgins routinely dumped laundry products, such as detergents, starches, softeners and powdered bleaches, from the smaller boxes in which they arrived (about 7 gallons) into larger, unsealed 50–gallon barrels. (Mem.Supp.Mot. Summ. J. ("Mot.") at 5). He would then label the barrels and discard the original boxes. (*Id.*)

On February 26, 1992, Mr. Higgins was dumping a box of concentrated powdered bleach called DriChlorine PX43 ("PX43"), manufactured by Diversey, into one of these barrels.[1] (Compl. at ¶ 11). Despite the warning label regarding the use and handling of PX43, Mr. Higgins did not wear any protective eyegear or gloves.[2] (Mot. at 6). While he was pouring the bleach into the storage container, the contents shifted and fell into the drum all at once. (*Id.*) A "mushroom cloud" of bleach dust filled the air, allegedly "envelop[ing] all of Mr. Higgins' face, head, and body." (Compl. at ¶ 11).

For several minutes, Mr. Higgins experienced throat irritation and a cough, but he was able to return to work for the rest of the day. (Mot. at 6). Two days later, on Friday, February 28, 1992, Mr. Higgins was working with mineral spirits at home in his bathroom, without protective gear. (*Id.* at 7). Over that weekend, Mr. Higgins again developed a cough, producing phlegm. (*Id.*) On Monday March 2, 1992, Mr. Higgins sought medical treatment from his physician and was diagnosed with pneumonia. (*Id.*)

Over the next week, Mr. Higgins' symptoms worsened and, on March 9, 1992, he was hospitalized. (*Id.*) He was released on

---

1. In its powdered form, PX43 bleach does not contain any chlorine. (Mot. at 4–5, n.4). Rather, it contains dichloro-dimethyl-hydantoin ("hydantoin"), a carrying agent that releases chlorine at varying rates when mixed with water. (Opp. at 2). Specifically, at a pH between 7 and 12, hypochlorite acid (which has some bleaching capacity) is released; at a pH between 4 and 7, hypochlorous acid (which has a faster bleaching capacity) is released; at a pH of 4 or under, chlorine is released. (Mot. at 4–5, n.4)

2. The PX43 bleach containers carry a yellow label which warns against "eye and skin irritation or burns" and "to avoid breathing dust, mist or product spray." (Mot., Ex. E). The label provides extensive information about proper use, storage, and handling (e.g., recommending the use of eye goggles, rubber gloves, and protective clothing), and it details the emergency procedures to follow if PX43 is ingested. (*Id.*)

March 30, 1992, and has used oxygen support continually since then. (*Id.*) Mr. Higgins alleges that he is totally and permanently incapacitated. (Compl. at ¶ 11).

On December 14, 1994, Mr. Higgins filed this action against Diversey in the Circuit Court for Baltimore City, alleging failure to warn, manufacturing and design defects, negligence, fraud, breach of warranty, strict liability, loss of consortium, and loss of parental support.[3] (Compl.) Diversey removed to this Court on January 19, 1995 and subsequently filed the pending motion to exclude expert testimony and for summary judgment. A hearing was held on March 3, 1997.[4]

## II. Legal Standard

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir.1993); accord *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). If a plaintiff fails to make this showing, then a defendant should not be

**3.** By Order dated September 25, 1995, this Court dismissed Mr. Higgins' claims for strict liability (Counts IX, X, and XI) and loss of parental support (Count XIII) because they are not recognized under Maryland law.

**4.** Because a hearing has already been held, the Court shall DENY Diversey's Motion for a Rule 104(a) Hearing as moot.

**5.** If a plaintiff "fail[s] to make sufficient showing on an essential element of her case with respect to which she has the burden of proof," then "the plain language of Rule 56(c) mandates the entry of summary judgment." *Celotex*, 477 U.S. at 322, 323. Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation .... to prevent 'factually unsupported

required to undergo the considerable expense of preparing for and participating in a trial. *Celotex*, 477 U.S. at 323–324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[5]

## III. Discussion

Two issues are before the Court today: (1) Whether, under Federal Rule of Evidence 702, this Court should exclude Mr. Higgins' expert testimony, and (2) Whether the Court should grant summary judgment for Diversey.

### A. Motion to Exclude Expert Testimony

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In discussing the requirements of Rule 702, the Supreme Court has emphasized that federal judges bear a "gatekeeping responsibility" to ensure that admitted testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 n. 7, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Cavallo v. Star Enterprise*, 892 F.Supp. 756, 760 (E.D.Va.1995), *aff'd on these grounds*, 100 F.3d 1150 (4th Cir.1996).[6]

claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987)(quoting *Celotex*, 477 U.S. at 323–324).

**6.** *Daubert* eliminated the requirement that scientific evidence "be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). By displacing the *Frye* test in deference to Fed.R.Evid. 702, the Supreme Court viewed itself as liberalizing, rather than tightening, the rules controlling the admission of expert testimony. *Daubert*, 509 U.S. at 588–89. Nevertheless, the five factors enumerated in *Daubert* still require that the methodology employed by an expert witness must be "ground[ed] in the methods and procedures of

■ In acting as gatekeepers, district courts must engage in a two-part inquiry. *Daubert*, 509 U.S. at 591. First, the trial judge must assess whether the proposed expert testimony consists of "scientific knowledge." *Id.* at 590; *Cavallo*, 892 F.Supp. at 760. To satisfy this standard of "evidentiary reliability," an expert's testimony must be "ground[ed] in the methods and procedures of science" and "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590.[7] Thus, "conjecture, hypothesis, 'subjective belief, or unsupported speculation' are impermissible bases for expert opinion and must be discarded." *Cavallo*, 892 F.Supp. at 761. (quoting *Daubert*, 509 U.S. at 590).[8]

■ Second, the judge must determine that the testimony will "assist the trier of fact." *Daubert*, 509 U.S. at 591; *Cavallo*, 892 F.Supp. at 761. This analysis focuses on "fit"—whether the testimony is relevant to an issue in the case. *Id.* As the Supreme Court stated, " 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591.

Mr. Higgins contends that he has suffered permanent respiratory injury from exposure to chlorine vapors. (Compl. at ¶ 11). To support his case, he seeks to introduce experts to testify on the "causal relationship between inhalation of chlorine and respiratory inflammation." (Opp. at 11). Mr. Higgins acknowledges that his experts have no background in PX43 or powdered bleach compounds. (*Id.* at n. 6).

In a remarkably similar case involving claims that exposure to spilled jet fuel caused permanent respiratory injury, Judge Ellis, of the Eastern District of Virginia, excluded the expert opinions of a toxicologist and an immunologist. *Cavallo*, 892 F.Supp. 756.[9] The Court concluded that both expert opinions were based largely on "hypothesis and speculation" instead of scientific knowledge and, therefore, were ultimately unreliable. *Id.* at 773. The toxicologist was found unreliable because his causation testimony was neither supported by the scientific literature nor accepted by the scientific community; moreover, the studies cited did not "fit" his conclusions. *Id.* at 769. As to the immunologist, Judge Ellis held that he had failed to adhere to any established scientific method, basing his causation testimony "solely on a temporal relationship." *Id.* at 773.

Likewise, Mr. Higgins' proposed experts have failed to provide any scientific evidence linking his injuries to PX43 exposure.[10] As

---

science" and "supported by appropriate validation." *Id.*, 509 U.S. at 590. If not, then a trial judge is duty-bound to reject the proffered testimony. "In short, *Daubert* commands that in court, science must do the speaking, not merely the scientist." *Cavallo*, 892 F.Supp. at 761.

7. The *Daubert* Court laid out four factors to utilize when assessing an expert's methodology: (1) whether the theory has been, or can be, tested, (2) whether it has been subjected to peer review or publication, (3) its known or potential rate of error, and (4) its degree of acceptance in the relevant scientific community. *Id.*, 509 U.S. at 593–94. The Fourth Circuit, in *Cavallo*, 100 F.3d at 1158, recently added a fifth factor: whether there are standards and controls over the methodology's implementation. *See also Ballinger v. Atkins*, 947 F.Supp. 925, 928 (E.D.Va.1996)(Cacheris, C.J.).

8. *See also In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 764 (3d Cir.1994)(affirming exclusion of expert's testimony that was "only a hypothesis which [the expert] had yet to attempt to verify or disprove by subjecting it to the rigors of scientific testing."); *Claar v. Burlington Northern R.R. Co.*, 29 F.3d 499, 502 (9th Cir.1994)(noting

that a district court is "affirmatively required to find that the experts' conclusions were based on scientific knowledge. This requirement means that the court had to determine that [experts] arrived at their conclusions using scientific methods and procedures, and that those conclusions were not mere subjective beliefs or unsupported speculation.").

9. Although decided only recently, the *Cavallo* opinions of the Eastern District of Virginia and the Fourth Circuit have been favorably cited by a number of federal courts. *See, e.g., Sanderson v. International Flavors & Fragrances, Inc.*, 950 F.Supp. 981, 998 (C.D.Cal.1996); *Hall v. Baxter Healthcare Corp.*, 947 F.Supp. 1387, 1413 (D.Or. 1996); *Ballinger*, 947 F.Supp. at 927; *Muzzey v. Kerr–McGee Chem. Corp.*, 921 F.Supp. 511, 520 (N.D.Ill.1996); *Cartwright v. Home Depot U.S.A., Inc.*, 936 F.Supp. 900, 905 (M.D.Fla.1996).

10. In fact, the expert testimony offered on behalf of Mr. Higgins is even more speculative than that at issue in *Cavallo*. In *Cavallo*, at least, the plaintiff had presented an expert to quantify the extent of Ms. Cavallo's exposure to the spilled jet fuel. Here, plaintiff's experts have made no attempt to quantify Ms. Higgin's exposure.

discussed below, their proffered testimony is speculative and, therefore, shall be excluded.

### 1. Dr. Yale Caplan

[5] Dr. Yale Caplan, a toxicologist with a Ph.D. in pharmaceutical chemistry, proposes to testify that Mr. Higgins suffered a "toxic reaction" from inhaling PX43. (Mot., Ex. B ("Caplan Dep.")). Specifically, Dr. Caplan theorizes that an unknown quantity of PX43, after coming into contact with a mucous membrane that contained water, dissolved in that moisture and released an unspecified acid, leading to the eventual release of "free chlorine" in Mr. Higgins' respiratory system. (Caplan Dep. at 97–103).

Dr. Caplan admits, however, that he has never seen such injuries before and has not conducted any experiments to test his hypothesis. (Caplan Dep. at 63–64, 67–68, 70). As a result, Dr. Caplan readily admits that he does not know: what threshold amount of airborne powder must be inhaled in order to suffer a "toxic reaction," whether the amount (and pH) of water contained in mucous membranes is sufficient to create such a "toxic reaction," how long it would take for such a "toxic reaction" to occur, or how much acid or chlorine would be released in such a "toxic reaction." (Caplan Dep. at 101–106).

Like the toxicologist in *Cavallo*, 892 F.Supp. 756, Dr. Caplan's testimony lacks sufficient scientific basis and is thus unreliable. Accordingly, the Court shall exclude Dr. Caplan's testimony.

### 2. Dr. Brian Schwartz

[6] Dr. Brian Schwartz, an M.D. certified in internal and occupational medicine, proposes to testify that PX43 must have caused Mr. Higgins' lung injuries because his symptoms were consistent with chlorine exposure. (Mot., Ex. C ("Schwartz Dep.")). His testimony, however, fails to ground this theory in scientific method.

Like Dr. Caplan, Dr. Schwartz admits having no knowledge about hydantoin (the active ingredient in PX43) or how it works. (Schwartz Dep. at 62–63, 77). He does not have any knowledge of the amount, concentration, or duration of Mr. Higgins' exposure to PX43, or of the amount needed to cause injury. (Schwartz Dep. at 87). Nor has he performed tests to support his theory, or located any support in the scientific literature. (Schwartz Dep. at 86–88, 101, 53–57). In fact, Dr. Schwartz stated that Mr. Higgins is probably the "first one" to suffer from such injuries. (Schwartz Dep. at 103). Moreover, Dr. Schwartz admits that he cannot rule out several other possible causes of Mr. Higgins' injuries—sleep apnea, infection, or exposure to mineral spirits. (Schwartz Dep. at 95–97, 113–114).

As stated in *Cavallo*, 892 F.Supp. at 773, an unverified theory based solely on a "temporal relationship" between exposure and injury is not sufficiently reliable to satisfy Rule 702. Accordingly, this Court shall exclude Dr. Schwartz' testimony.

### 3. Dr. Calvin Fuhrmann

[7] Dr. Calvin Fuhrmann, M.D., a pulmonologist, seeks to testify that Mr. Higgins inhaled PX43 particulates into his lower lungs, causing a chemical reaction that led to his injuries. (Mot., Ex. L ("Fuhrmann Dep.")). Although Dr. Fuhrmann is familiar with the harmful effects of chlorine, he has provided no scientific basis for his theory that PX43 releases chlorine when it comes into contact with moisture in the nasal passages and lungs. Indeed, he admits that he has no understanding about the amount of hydantoin in PX43, the manner in which it

---

Similarly, in *Cavallo*, the plaintiff's experts cited to a body of studies, albeit slender, attempting to ascertain the effects upon humans of exposure to volatile organic compounds. The studies demonstrated that exposure could cause short-term complications. In this case, Mr. Higgins could cite to no studies of the effect of inhaling either bleach powder, in general, or hydantoin, in particular.

In *Cavallo*, the expert witness could cite to anecdotal reports of individuals who claimed to have suffered permanent effects from long-term exposure to volatile organic compounds. Mr. Higgins cannot even cite to such anecdotal evidence. In fact, one of his own experts, Dr. Schwartz, testified that Mr. Higgins might be the only person to have allegedly suffered from exposure to hydantoin. (Mot., Ex. C, at 103).

Mr. Higgins, like the plaintiff in *Cavallo*, has been unable: (1) to establish the amount of powder absorbed by his body, (2) to establish the dose required ("dose-response") to cause his harm, and (3) to exclude other possible causes of his illness.

works, or the amount and concentration needed to cause injury. (Fuhrmann Dep. at 31–35, 114–15, 124). Nor has he performed any research or tests in forming his opinions. (Fuhrmann Dep. at 90–91). Moreover, Dr. Fuhrmann has never seen injuries like those of Mr. Higgins. (Fuhrmann Dep. at 91–92).

Such untested opinions do not "rest[] on a reliable foundation," as required by Rule 702 and interpreted by the Supreme Court in *Daubert.* Accordingly, this Court shall exclude Dr. Fuhrmann's testimony.

### 4. Dr. Harry Snyder

■ Dr. Harry Snyder, a Ph.D. in experimental psychology who is an expert in "human factors" and warnings, proposes to testify that Diversey's PX43 label is defective because it fails to include a warning about possible lung injury or death. (Mot, Ex. A ("Snyder Dep.") at 128–30, 155, 159–61). Dr. Snyder does not, however, provide any evidence of a causal link between PX43 and such injuries. (*Id.*) In fact, prior to this litigation, he had never heard of any cases involving similar lung injuries. (*Id.*) For the purpose of his conclusions, Dr. Snyder "assumed that the injury and difficulties that Mr. Higgins has were caused by his inhalation of the bleach product," and he "assumed either that [the hazard] was known and recognized or should have been known and recognized" by Diversey. (Snyder Dep. at 105, 108). He provides no scientific grounding for these assumptions. *Daubert* 509 U.S. at 590.

Because Dr. Snyder's testimony rests upon unsubstantiated assumptions, the Court finds it unreliable. Accordingly, the Court shall exclude Dr. Snyder's testimony.

In sum, none of Mr. Higgins' proposed experts has established a reliable foundation on which to base his testimony. To adapt the Fourth Circuit's remarks in *Cavallo* about such speculative testimony:

It may well be that the [bleach] spill forever [damaged Mr. Higgins' lungs]. But the published scientific literature and test results simply do not support that conclusion at that time ... the price paid for this seemingly stringent standard of reliability is that, unavoidably, some legitimate injuries will be left unaddressed.

100 F.3d at 1159 (quoting *Cavallo,* 892 F.Supp. at 773). Accordingly, the Court shall GRANT Diversey's Motion to Exclude Expert Testimony as to all four experts.

### B. Motion for Summary Judgment

#### 1. Failure to Warn

■ Mr. Higgins alleges that Diversey is liable for its failure to provide a sufficient warning that inhalation of PX43 could be fatal or cause permanent lung injuries. (Compl. at ¶¶ 13, 16, 17, 30, 32, 34, 38–39, 43, 48, and 52–53).[11] A failure to warn claim, under either negligence or strict liability, requires the following elements: (1) that the defendant owed a duty to warn; (2) that the defendant breached that duty; (3) that there was a direct causal connection between the defendant's failure and the alleged injuries; and (4) that the plaintiff was harmed. *Mazda Motor of Am. v. Rogowski,* 105 Md.App. 318, 325, 659 A.2d 391, *cert. denied,* 340 Md. 501, 667 A.2d 342 (1995), *cited in Binakonsky v. Ford Motor Co.,* 929 F.Supp. 915 (D.Md. 1996).[12]

■ To establish a breach of duty, a plaintiff must prove that the defendant failed to take the requisite level of care in promulgating a warning. *Dudley v. Baltimore Gas & Electric Co.,* 98 Md.App. 182, 202, 632 A.2d 492 (1993). A manufacturer cannot be held liable for failure to warn unless it has "knowledge, or by application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ... danger." *Owens–Illinois v. Zenobia,* 325

---

11. Although the bulk of Mr. Higgins' remaining claims (Counts I, IV, V, VI, VII, and XII) are labeled under various headings (e.g., misrepresentation and negligence), they are all premised on Diversey's alleged failure to warn.

12. Although the *Mazda* court noted some minor differences between negligence and strict liability claims for failure to warn (e.g., there is no con-

tributory negligence defense in strict liability), it recognized their "strong resemblance" and common elements. 105 Md. at 325, 66 A. 44 (citing *Nigh v. Dow Chem. Co.,* 634 F.Supp. 1513, 1517 (W.D.Wis.1986)("distinguishing between negligence and strict liability in failure to warn cases should be left to those who count angels on the head of a pin")).

Md. 420, 601 A.2d 633 (1992)(quoting Restatement (Second) of Torts § 402A, comment j (1965)), *cited in Foster v. American Home Prod. Corp.*, 29 F.3d 165, 169–70 (1994).

In determining whether a defendant "should have know[n]" of a hazard, the defendant is "held to the knowledge of an expert in the field" and, "at a minimum, he must keep abreast of scientific knowledge, discoveries, and advances." *Zenobia*, 325 Md. at 437, 601 A.2d 633; *Dudley*, 98 Md. App. at 200, 632 A.2d 492. *See also* W. Page Keeton, et al., *Prosser and Keeton on Torts* § 96, at 685 (5th ed.1984). As a result, a cause of action cannot arise when the defendant, as well as the scientific community, lacked sufficient knowledge about a product's dangerous quality. *Id.*, 325 Md. at 433.

Diversey cannot be held liable for failure to warn against potential lung damage or death caused by PX43 because it could not reasonably have been aware of this hazard.[13] Indeed, as discussed above, even Mr. Higgins' experts have conceded that his injuries have never been seen before and are unreported in the literature. (Caplan Dep. at 63–64; Fuhrmann Dep. at 91–92; Schwartz Dep. at 87, 103). This conclusion was echoed by Mr. Higgins' counsel at the hearing.

Accordingly, because Mr. Higgins has failed to state a *prima facie* claim for failure to warn, this Court shall, by separate Order, GRANT Diversey's Motion for Summary Judgment as to Counts I, IV, V, VI, VII and XII.[14]

### 2. Gross Negligence

Mr. Higgins also alleges a claim of gross negligence against Diversey (Count VIII), seeking punitive damages. This cause of action requires a showing, by clear and convincing evidence, of "actual malice." *Zenobia*, 325 Md. at 462, 601 A.2d 633.

Actual malice is defined as (1) actual knowledge, and (2) conscious disregard of foreseeable harm. *Id.; Owens–Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 682 A.2d 1143 (1996); *Schreiber v. Cherry Hill Constr. Co., Inc.*, 105 Md.App. 462, 492, 660 A.2d 970 (1995). *See also Bresnahan v. Bresnahan*, 115 Md.App. 226, 244, 693 A.2d 1, 9 (Md.App. 1997)(prelim. op.)("In our review of the Court of Appeals's cases since *Zenobia*, we have seen no weakening of the *Zenobia* holding—rather, its scope, whenever possible, appears to have been extended").

Mr. Higgins has produced no evidence that Diversey was aware of PX43's allegedly harmful effect, much less that this risk was consciously disregarded. Accordingly, the Court shall GRANT Diversey's Motion for Summary Judgment as to Count VIII.

### IV. Conclusion

For the aforementioned reasons, this Court shall, by separate Order: (i) GRANT Diversey's Motion to Exclude Expert Testimony; (ii) GRANT its Motion for Summary Judgment as to Counts I, IV, V, VI, VII, VIII, and XII; (iii) DENY as moot its Motion for a Rule 104(a) Hearing; and (iv) GRANT Diversey leave to file a supplemental summary judgment motion if, by May 1, 1997, Mr. Higgins has not moved to dismiss voluntarily Counts II and III.

---

**13.** Diversey does provide warnings against known hazards, and its PX43 containers advise users to don protective gear to prevent irritation and burns. *See supra*, note 2. The PX43 labels also warn users not to inhale the bleach powder. *Id.*

**14.** At the hearing, plaintiffs indicated their intention to voluntarily dismiss the defective design and manufacture claims (Counts II and III). Accordingly, this Court shall not rule on these claims at this time. If plaintiffs have not filed a motion to dismiss these claims by May 1, 1997, the Court will permit defendants to file a supplemental motion for summary judgment.