**Christophe ROCHE and Juanita Roche, Plaintiffs,**

v.

**LINCOLN PROPERTY CO. and SWIB Investment Co., Defendants.**

No. CIV.A.02–1390–A.

United States District Court, E.D. Virginia, Alexandria Division.

July 25, 2003.

Jerry Malcolm Phillips, Phillips, Beckwith, Hall & Chase, Fairfax, VA, for Plaintiffs.

Connie Nora Bertram, Venable, Baetjer, Howard & Civiletti, LLP, Washington, DC, John Francis Scalia, Greenberg Traurig, LLP, McLean, VA, Michael Edward Reheuser, Jordan, Coyne & Savits, LLP, Fairfax, VA, Michael Robert Goodstein, Bailey Cavalieri, LLC, Columbus, OH, for Defendants.

*MEMORANDUM OPINION*

LEE, District Judge.

THIS MATTER is before the Court on Defendants, Lincoln Property Company's ("Lincoln") and the State of Wisconsin Investment Board's ("SWIB"), motions to bar the testimony by Richard Bernstein, M.D., and for summary judgment on all claims for personal injury. This case concerns Plaintiffs Christophe and Juanita Roche's claim for personal injuries stemming from exposure to alleged toxic levels

of mold in their apartment. The Roches contend that Defendants negligently failed to properly maintain their apartment and allowed toxic levels of mold to develop, causing the Roches and their family to suffer respiratory and other medical problems. The issue before the Court is whether Dr. Bernstein's testimony regarding the proximate cause of the Plaintiffs' personal injuries, allegedly resulting from exposure to toxic levels of mold, satisfies the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. For the reasons stated herein, the Court concludes that Dr. Bernstein's testimony lacks, as to the proximate cause of Plaintiffs' personal injuries, a methodology satisfying *Daubert* because: (1) Dr. Bernstein failed to adhere to the established methodology of differential diagnosis by not ruling in the suspected causes and by not ruling out other possible causes; (2) he failed to establish why various reports and studies showing some correlation between exposure to mold and allergic reactions support his conclusions that the mold in the apartment was the proximate cause of Plaintiffs ailments, and (3) he relied solely on temporal relation to arrive at his conclusions.

## I. BACKGROUND

Christophe and Juanita Roche and their children lived in an apartment at Westfield Village from April 2001 to March 2002. The Roches claim that their apartment was poorly maintained, that there were water leaks, holes in the wall, and mold growing within the apartment. The Roches contend that, as a result of being exposed to toxic levels of mold, they currently suffer respiratory and other ailments.

Plaintiffs leased their apartment from SWIB. Lincoln managed the Westfield Village Apartments in Centreville, Virginia. Plaintiffs complained to Lincoln on several occasions about the poor condition of their apartment. Plaintiffs complained of water leaks needing repair, of holes that had been cut in the wall, of the carpet being torn up, and of "the fact that mold was all over [the] apartment." (Compl.¶ 17.) Plaintiffs allege that toxic levels of mold developed within the apartment due to moisture damage from the leaky fixtures and plumbing. In February 2002, Plaintiffs engaged a consultant, Ronald G. Ginste of Potomac Environmental Testing Services, to conduct testing for the presence of mold in the apartment, and the consultant discovered that there was "extensive" mold contamination in the apartment. (*Id.* ¶ 28.) Specifically, Mr. Ginste found several types of molds present in the apartment: Stachybotrys, Cladosporium, Penicillium, Aspergillus, Smuts, Hyphal elements, and epicoccum.

Subsequent to leaving the apartment in March 2002 and after having filed this action, Plaintiffs sought treatment from Dr. Bernstein, an allergist. Mr. Roche complained of memory loss, chronic headaches, sinus problems, mild hypersensitivity to smells, and chronic nasal stuffiness. (Defs.' Mem. Supp., Ex. D. at 2.) Mrs. Roche complained of memory loss, chronic upper respiratory sinus symptoms, some chest congestion, and shortness of breath. (*Id.* at 4.) Dr. Bernstein first examined the Plaintiffs on December 24, 2002. After his initial examination, Dr. Bernstein wrote to the Plaintiffs stating that he believed they were dealing with two health issues: first, the allergenic effects of the molds to which the Plaintiffs were exposed, primarily Cladosporium and Aspergillus; second, sick-building symptoms "which were probably secondary to the mycotoxic effects of the Stachybotrys, which can also be seen with Aspergillus." (*Id.* at 1.) Dr. Bernstein recommended that Mr. Roche stop smoking, that the Roches find a new home for their

cat, and that they start a low-sugar diet. (*Id.*) In his inter-office report, Dr. Bernstein noted that Mrs. Roche had a history of asthma. (*Id.* at 4.) Dr. Bernstein scheduled the Plaintiffs for allergy testing. (*Id.* at 3, 5.)

On February 12, 2003, the Plaintiffs presented themselves for allergy testing through skin endpoint titration. Dr. Bernstein found that Mr. Roche was allergic to several common allergens found in Northern Virginia; however, Mr. Roche was not allergic to the molds found in the apartment—namely Aspergillus, Cladosporium, or Penicillium. (Bernstein Dep. at 14:9–20:9.) Mr. Roche was allergic to mites, cockroaches, cats, dust, most weeds and grasses he was tested for, and all trees in the test. In addition, Mr. Roche smoked about 8 cigarettes per day, and the family owned a cat. Dr. Bernstein repeated his prior recommendation that Mr. Roche stop smoking because smoking is a "nonspecific irritant" which makes allergic symptoms worse. (*Id.* at 20:10–21:11.) He restated his recommendation that Mr. Roche find a new home for the cat. (*Id.* at 20:10–12.) As to Mrs. Roche, Dr. Bernstein found that she was allergic to most allergens, including the molds Aspergillus, Cladosoporium, and Penicillium. (*Id.* at 21:12–23:7.) Mrs. Roche was also allergic to cats. Dr. Bernstein also recommended that Mrs. Roche get rid of the cat. (*Id.* at 23:11–21.) Dr. Bernstein, however, performed no testing addressing the Plaintiffs' reaction to Stachybotrys because Dr. Bernstein does not consider Stachybotrys to be an allergen. (*Id.* at 26:20–27:9.)

The Scheduling Order in the case required that the Plaintiffs designate expert witnesses pursuant to Federal Rule of Civil Procedure 26 and to comply with the other mandates of the statute by December 15, 2002. *See* Fed.R.Civ.P. 26(a)(2). On December 27, 2002, the Plaintiffs designated Dr. Bernstein as one of three experts; Plaintiffs failed to provide any of the required disclosures under Rule 26(a)(2), i.e., the expert report. Defendants moved to bar Dr. Bernstein's testimony based on Plaintiff's failure to submit a Rule 26 report. Magistrate Judge Sewell denied the motion because he found that Dr. Bernstein was a treating physician under *Hall v. Sykes*, 164 F.R.D. 46 (E.D.Va.1995), and, therefore, exempt from the expert report requirement. Thus, Plaintiffs did not need to submit a report to the extent that Dr. Bernstein was going to testify about his treatment of the Plaintiffs.

Defendants now bring two motions. First, Defendants seek to exclude Dr. Bernstein's testimony as to specific causation for both Plaintiffs for failure to adhere to the principles enunciated in *Daubert* because Dr. Bernstein "has no appropriate methodology to opine that molds in the apartment contributed to any health problems." (Defs.' Mem. Supp. at 1.) Defendants contend that Dr. Bernstein has failed, as part of his differential diagnosis, to rule-in Stachybotrys as one of the molds that caused Plaintiffs' injuries. Furthermore, Dr. Bernstein failed to rule-out, as to both Plaintiffs, the other commonly found allergens as potential causes for Plaintiffs' injuries. Defendants also claim that Dr. Bernstein has failed to rule-in Aspergillus, Cladosporium, and Penicillium as causes for Mr. Roche's injuries because Mr. Roche did not react to these three molds. In response, Plaintiffs contend that Dr. Bernstein's conclusion that their symptoms were caused by exposure to molds is supported by his findings. Mainly, Dr. Bernstein found that the Plaintiffs were asymptomatic when they arrived at the Westfield Village apartment. Dr. Bernstein also referred to literature relating to Stachybotrys and sick-building syndrome he had read and on his previous

experience with sick-building syndrome patients. Dr. Bernstein also relied on Mr. Ginste's report on the air sampling of the Roches' apartment, which broke down the specific levels of the various molds found throughout the apartment; and he relied on the P.K. Jarvis Toxin Report, which indicated the types of toxins that were present and produced by the Stachybotrys in the Roches' apartment. Defendants' second motion, in the alternative, is for summary judgment. Defendants contend that the Plaintiffs lack sufficient causation because Dr. Bernstein has stated that there were many possible causes for Plaintiffs' allergic reactions.

The Court heard oral argument on the motions on April 2, 2003; the matters were taken under advisement. The Court reviewed the record, the parties' arguments, and the relevant case law; on April 16, 2003, the Court issued an Order granting the motion to exclude Dr. Bernstein's testimony for the reasons to be stated in a subsequent memorandum opinion. Although both motions are before the Court, this Memorandum Opinion addresses only the motion to bar Dr. Bernstein's testimony. The Court addresses the motion for summary judgment in a separate order addressing the parties' cross-motions for summary judgment on all remaining claims.

## II. DISCUSSION

### A. *Standard of Review*

The Federal Rules of Evidence provide the Court with the power to determine any "preliminary questions concerning the qualification of a person to be a witness ... or the admissibility of evidence ...." Fed.R.Evid. 104(a). In determining the admissibility of expert testimony, the Court relies on Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Glossing on Rule 702, the United States Supreme Court emphasized that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. Thus, conjecture or "subjective belief" or "unsupported speculation" will not suffice. *See id.* at 590, 113 S.Ct. 2786. In performing this "gatekeeping" task, the Court must make a preliminary assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. Courts generally consider four factors in determining whether the theory or technique is "scientifically valid": (1) whether the theory or technique used by expert can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used; and (4) the degree of the method's or conclusion's acceptance within the relevant scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786; *United States v. Dorsey,* 45 F.3d 809, 813 (4th Cir.1995). This list of factors, however, is not exhaustive; courts have considered other factors in assessing whether an ex-

pert's testimony is reliable.[1] These factors include: (1) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion[2] and (2) whether an expert has accounted for obvious alternative explanations.[3] As part of the second prong, the Court must determine whether the expert testimony is relevant to an issue in the case. *Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786. While the "scientifically valid" and the "relevance" prongs are distinct in their inception, the two prongs may overlap in a particular case. Thus, "a determination regarding the scientific validity of a particular theory requires not only an examination of the trustworthiness of the tested principles on which the expert opinion rests, but also an analysis of the reliability of an expert's *application* of the tested principles to the particular set of facts at issue." *Cavallo v. Star Enterprise,* 892 F.Supp. 756, 762–63 (E.D.Va.1995), *rev'd in part on other grounds,* 100 F.3d 1150 (4th Cir.1996). These are the principles that govern the Court's assessment of Dr. Bernstein's opinions.

### B. *Dr. Bernstein's Testimony*

Dr. Bernstein is board certified in internal medicine and pulmonary diseases; however, he is not board certified as an allergist. In his affidavit of March 24, 2003, Dr. Bernstein states:

> I am in a position to state that Mr. and Mrs. Roche were previously healthy but became ill following a mold exposure in the apartment in which they had been living for one year. Mrs. Roche had allergic symptoms as a child, but she had been asymptomatic. Mr. Roche developed problems with chronic headaches and nasal stiffness. Mrs. Roche developed symptoms of shortness of breath, sinus congestion and chest congestion. Allergy testing for Mrs. Roche revealed significant allergies to molds, trees, grasses, pollens and dust mite. Allergy testing for Mr. Roche revealed significant allergies to dust mite, cat, molds, weeds, grasses, and trees.

(Pls.' Mem. Opp'n, Bernstein Aff. ¶ 5.) Dr. Bernstein then concludes that, within a reasonable degree of medical certainty, the Roches' symptoms "were caused by their exposure to molds, and that they became sensitized to molds and developed allergies to molds as a result of living in a contaminated apartment." (*Id.* ¶ 6.) Dr. Bernstein notes that his diagnosis is based on differential diagnosis (*id.* ¶ 7) and that "it is significant that [the Roches] were asymptomatic until they moved into the apartment" (*id.* ¶ 6). To form his opinion, Dr. Bernstein relied on: (1) the medical history relayed by the Roches on December 24, 2002 (*id.* ¶ 5); (2) the past medical records, which had been sent to Dr. Bernstein the day before the deposition on February 26,

1. *See* Fed.R.Evid. 702 Advisory Committee Notes, 2000 Amendments.

2. *See General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered"); *see also Schmaltz v. Norfolk & Western Ry. Co.,* 878 F.Supp. 1119, 1122 (N.D.Ill.1995) ("The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue ... is too wide in the present case."); *Chikovsky v. Ortho Pharmaceutical Corp.,* 832 F.Supp. 341, 346 (S.D.Fla.1993) (citing the expert's ignorance of the amounts of Retin–A absorbed by the plaintiff, noting the absence of any established dose-response relationship for Vitamin A and birth defects, and finding that the expert's "analogies to research concerning Vitamin A and other Vitamin A derivatives is [sic] wanting").

3. *Claar v. Burlington N.R. Co.,* 29 F.3d 499 (9th Cir.1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition).

2003 (*id.* ¶ 1); (3) blood test results, CAT scan results, MRI results, and X-rays (*id.* ¶ 2); (4) a literature review regarding Stachybotrys; (5) the P.K. Jarvis Toxin Report, indicating the type of toxins that were present and produced by the Stachybotrys in the Roches' apartment (*id.* ¶ 3); (6) the skin endpoint titration testing (*id.* ¶ 5); (7) the RAS Test for Stachybotrys that was performed on the Roches' blood sample (*id.* ¶ 6); and (8) the certified industrial hygienist's—Mr. Ginste—report on the types and quantities of molds found in the Roches' apartment on February 24, 2002.

Although Dr. Bernstein makes his conclusion "within a reasonable degree of medical certainty," his conclusion is vague and generalistic, as it fails to distinguish between harms attributable to the mold exposure and the Roches' allergic reactions to other common allergens, such as cats, dust mites, weeds, grasses, and trees. This omission is fatal to Dr. Bernstein's conclusion and to his methodology of differential diagnosis; the omission is also significant because the Roches may only recover for specific injuries directly attributable to their exposure to the mold found in the apartment. This omission also precludes recovery for symptoms related to the Roches' sensitization to molds—i.e., how exposure to the molds in the apartment injured the Roches in such a way as to render them more susceptible to such symptoms.

### C. *Analysis*

█ As an initial procedural matter, Plaintiffs proffered Dr. Bernstein to Magistrate Judge Sewell as a "treating physician." However, a review of Dr. Bernstein's deposition, his affidavit which amplifies and contradicts his deposition, and his supplemental report demonstrates that Plaintiffs have expanded Dr. Bernstein's expertise and opinions well within the role of a testifying expert without complying with the Court's Scheduling Order or Federal Rule of Civil Procedure 26. Thus, the Court analyzes Dr. Bernstein's testimony as a testifying expert and not as a treating physician. The Court finds that Dr. Bernstein's testimony is inadmissible because Dr. Bernstein is unable to establish, through any acceptable methodology, that the Plaintiffs were injured by the mold allegedly contained within their apartment. The Court concludes that Dr. Bernstein's testimony is based on conflicting facts, conflicting reports and literature, fails to rule-in and rule-out several potential allergens, and relies solely on temporal relation; thus, his differential diagnosis is unsupported and unreliable.

#### 1. The Methodology

If scientifically valid, Dr. Bernstein's testimony would clearly be admissible as to causation because it would show that the Roches' exposure to the molds in the apartment caused their illnesses. Thus, the Court focuses its analysis on the scientific validity test under *Daubert.* The Court specifically focuses on the reliability of the methodology employed by Dr. Bernstein and on his adherence to, and application of, that methodology. In his affidavit, Dr. Bernstein states he employed a differential diagnosis methodology to arrive at his conclusion [4]; thus, Dr. Bernstein should have ruled in the various molds that the Roches were exposed to at their apartment, and he should have

4. Differential diagnosis is "a process whereby medical doctors experienced in diagnostic techniques provide testimony countering other possible causes ... of the injuries at issue." *Hines v. Consolidated Rail Corp.,* 926 F.2d 262, 270 n. 6 (3d Cir.1991).

ruled out all other potential causes to determine that the Roches' injuries were proximately caused by these molds—or at least that the molds aggravated their previous conditions. If faithfully applied, the methodology of differential diagnosis "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999) (quoting *Brown v. Southeastern Penn. Transp. Auth. (In re Paoli R.R. Yard PCB Litig.)*, 35 F.3d 717, 758 (3d Cir.1994)). Dr. Bernstein determined from a review of the Roches' medical history, from their blood test results, CAT scan results, MRI results, and X-rays, from a literature review regarding Stachybotrys, from the P.K. Jarvis Toxin Report, from the skin endpoint titration testing, from the RAS Test for Stachybotrys, from the certified industrial hygienist's report, and from the timing of their exposure to the molds in their apartment in relation to their development of symptoms that the Roches' exposure to the molds caused their illnesses.

Dr. Bernstein's differential diagnosis is important to determine specific causation.[5] In this case, the specific causation issue is whether Stachybotrys, Penicillium, Aspergillus, and Cladosporium caused the Roches' symptoms and, more specifically, how each of the molds contributed to the Roches' symptomology. A reliable differential diagnosis typically, though not invariably, is performed after "physical examination, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is most likely. *Westberry*, 178 F.3d at 262. "A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion." *Id.* at 265; *see also Cavallo*, 892 F.Supp. at 771 ("If other possible causes of an injury cannot be ruled out, or at least the probability of their contribution to causation minimized, then the 'more likely than not' threshold for proving causation may not be met.").

Dr. Bernstein's differential diagnosis, however, is scientifically invalid and unreliable. First, Dr. Bernstein fails to rule in the molds found in the apartment—specifically Aspergillus, Cladosporium, and Penicillium—as possible causes for Mr. Roche's allergy and flu-like symptoms because Mr. Roche was not allergic to these molds. Second, Dr. Bernstein did not conduct any testing concerning the Roches' susceptibility to Stachybotrys. He notes, however, that the RAS Test for Stachybotrys that was performed on the Roches' blood samples was inconclusive (Bernstein Aff. ¶ 6), although that test revealed that the Roches had not built up antibodies to Stachybotrys (Defs.' Mem. Supp. Ex. F, Ronald E. Gots Dep. 128:1–15).[6] Third, Dr. Bern-

5. In their Memorandum in Support, Defendants acknowledge that the some molds can generally cause allergic reactions—general causation. The issue is Plaintiffs' lack of specific causation.

6. In its report on the RAS Test results, Quest Diagnostics notes that the RAS Test has not been cleared or approved by the FDA. Quest Diagnostics further explains that

> "[i]n those patients who have symptoms and physical findings of hypersensitivity pneumonitis ["HP"], the presence of elevated IgG and IgA responses to a mold can be used to support the diagnosis of HP. In the absence of these clinical findings, the IgG and IgA antibody responses only indicate

stein's reliance on the industrial hygienists report is misplaced because Mr. Ginste, in the report, notes that "the severity of exposure is difficult to estimate" and that "no direct link between [the Roches'] health complaints and their exposure can be shown through the methods of this investigation ...." (Bernstein Dep. Ex. 1, Mold Investigation Report 5111 Woodmere Dr., Unit 104, 3/17/02 (hereinafter "Mold Investigation Report") at 6.) Furthermore, Dr. Bernstein is not a toxicologist and admitted to lacking any knowledge of the levels required for these various molds to become toxic or of the levels required for the molds to affect the Roches. Thus, he is unable to establish a direct nexus between the levels of exposure to the mold and any subsequent illnesses that overcame the Roches. Fourth, Dr. Bernstein's reliance on articles concerning Stachybotrys and other molds and their effects on humans is erroneous because most of those and other articles state that there are no standards as to what quantity of mold is acceptable in indoor environments with respect to health and that establishing a direct link between mold exposure and health problems is difficult because individuals have different sensitivities to molds. Fifth, Dr. Bernstein fails to state how the "extreme immune inhibitors" produced by the Stachybotrys found in the Roches' apartment and tested at the P.K. Jarvis laboratory proximately caused the Roches' ailments.

■ Sixth, Dr. Bernstein fails to rule out the Roches' significant allergies to cats, dust mites, grasses, weeds, and trees as potential causes for the Roches' symptoms. Seventh, as to his conclusion that the Roches became sensitized by their exposure to the molds in the apartment, Dr. Bernstein stated in his deposition that it would not be possible to make a determination of sensitization unless the Roches had been tested for allergies prior to moving into the apartment. (*See* Bernstein Dep. 33:7–20.) Eighth, Dr. Bernstein fails to address how his consideration of the blood test results, the CAT scan results, the MRI results, and the X-rays contributed to his determination that the Roches' symptoms came about as a result of their exposure to molds. Ninth, Mrs. Roche's medical history, as relayed by her to Dr. Bernstein, reveals that she had been to the emergency room on several occasions with similar symptoms prior to her moving into the Westfield Village apartment. Thus, Dr. Bernstein's own office files contradict his conclusion that Mrs. Roche was asymptomatic prior to her arrival at the apartment. Tenth, Dr. Bernstein's reliance on temporal causation as the determinative factor in his analysis is suspect because "it is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Rule] 702." *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F.Supp. 1119, 1122 (N.D.Ill.1995). The following is a thorough discussion of the Court's findings and conclusions as to Dr. Bernstein's testimony.

### 2. Differential Diagnosis

As previously stated, a reliable differential diagnosis must rule in the suspected cause of an injury and rule out other causes or determine which of the remaining explanations is most likely the cause. In order to support his conclusion—that the Roches' symptoms were caused by their exposure to molds and that the Roches became sensitized to molds and developed allergies to molds as a result of living

prior exposure [to an] immonuchemically-related fungi."

(Defs.' Mem. Supp. Ex. F, Gots Dep. Ex. 3, 4.)

in the apartment, Dr. Bernstein must rule in the suspected molds and rule out other allergens that could potentially cause the Roches' symptoms. Dr. Bernstein has failed to do so in this case, and his differential diagnosis fails to meet the requirements, under *Daubert*, of a scientifically valid methodology.

a. *The Medical Tests*

Based on the results of the skin endpoint titration testing, it is undisputed that the Roches were allergic to multiple allergens. Mr. Roche was allergic to all weeds tested (Lambs Quarters, Wormwood Sage, S. Ragweed, E. Plaintain, Sheep Sorrel, and Pigweed), to Bermuda and Timothy grasses, to all trees tested (Elder, Sycamore, Cottowood, Oak, Ash, Hickory, Birch, and Elm), to several organisms (Farinae Mite, Cockroach, Cat, and Pt. Mite), to A. Dust and to a few molds (Alternaria, Candida, and Stemphylium).[7] Significantly, the skin endpoint titration test included Aspergillus, Hormodendrum (hereinafter "Cladosporium"), and Penicillium (three of the molds found in the Westfield Village apartment); however Mr. Roche was not allergic to these three molds. Mrs. Roche was also allergic to a host of allergens including weeds (Wormwood Sage, E. Plaintain, and Pigweed), Bermuda and Timothy grasses, trees (Elder, Cottonwood, Ash, Hickory, and Elm), all organisms tested (Farinae Mite, Cockroach, Cat, Dog, and Pt. Mite), A. Dust, Feathers, and most molds tested (Candida, Cladosporium, Mucor, Penicillium, Stemphylium, Aspergillus, Helminthosporium, Fusarium, Epidermatophyton, and Pullularia). Therefore, as to Mr. Roche, Dr. Bernstein could not objectively rule in Aspergillus, Cladosporium, or Penicillium as potential causes for Mr. Roche's chronic headaches or nasal stiffness. As to Mrs. Roche, Dr. Bernstein could rule in the three molds Aspergillus, Cladosporium, and Penicillium since she reacted to these molds.

b. *Ruling in Stachybotrys*

The Mold Investigation report revealed that Stachybotrys was also present within the Roches' apartment; however, from his testing, Dr. Bernstein is unable to rule in Stachybotrys as a potential cause. Dr. Bernstein did not directly test the Roches for a reaction to Stachybotrys. Dr. Bernstein admitted to performing no test regarding Stachybotrys because he does not consider Stachybotrys as an allergen. (Bernstein Dep. at 26:20–27:9.) On the other hand, the Roches had undergone laboratory testing which revealed that neither Mr. nor Mrs. Roche had developed antibodies to an immonuchemically-related fungi. (*See* Gots Dep. Ex. 3.) Plaintiffs contend that they could not have undergone direct testing for reactions to Stachybotrys because Stachybotrys produces micotoxins, which are essentially poisons. (Pls.' Mem. Opp'n at 5–6.) They further maintain that the previous Stachybotrys

7. Dr. Bernstein explains the Skin endpoint titration testing:

> [B]asically, we're using serial delusions [sic] so everything is a 5th dilution, your concentrate is a 1 to 20 dilution, and so a No. 1 would be 1 to 100 dilution, a No. 2 would be a 1 to 500 dilution, a No. 3 would be a 1 to 2500 dilution, a No. 4 dilution ... 1 to 125000 dilution ... and so classically what you do is, start off testing at a relatively low concentration, which we all ready [sic] start off at number 6s, which is a 1 to 325,000 dilution because you don't want anyone to have an adverse reaction from the testing; and then you progressively work your way up, and when you get a 7 millimeter wheel that is generally considered positive as indicative of the person having an allergic reaction to that substance that you're testing.

(Bernstein Dep. at 6:10–7:3.)

testing was inconclusive because the test is based on finding the antibody to Stachybotrys and that the human body takes considerable time to build such an antibody. (*Id.* at 6.) Furthermore, they contend, the test is not FDA approved. Even accepting Plaintiffs' arguments that the Stachybotrys test is inconclusive, Dr. Bernstein could not reasonably rule in Stachybotrys because (1) Dr. Bernstein is an allergist—not a toxicologist, a microbiologist, or an industrial hygienist—and he does not consider Stachybotrys an allergen, (2) he performed no test as to the Roches' sensitivity to Stachybotrys, and (3) the one test that was performed on the Roches' blood revealed that they had not built up any antibodies to Stachybotrys. Thus, Dr. Bernstein, in the absence of objective medical findings, rules in Stachybotrys as a potential cause for the Roches' illnesses and bases his reasoning on several articles he read prior to, and subsequent to, his deposition, on his prior experience with other patients who have been exposed to Stachybotrys, and on his experience with patients suffering from "sick-building" syndrome.

c. *A Toxicologist's Methodology*

Although not addressed by either party in their multiple briefs, the Court finds that Dr. Bernstein's next step was to determine whether the particular molds could have caused the Roches' injuries—that is, whether the Roches' exposure to the specific levels of molds found in the apartment could have actually caused their injuries. Thus, although Dr. Bernstein is not a toxicologist, he must nonetheless apply the principles and methods of toxicology if he is to give an opinion on an issue relating to that specialty.[8] *Cavallo,* 892 F.Supp. at 771–72. In *Cavallo,* the court addressed the methodology adopted for toxicologists, used by the toxicology expert in that case and endorsed by the World Health Organization, the National Academy of Sciences, and various agencies of the United States Government. *Id.* at 764. That methodology requires that:

> First, an evaluation is made of the [molds] to which the individual might have been exposed, and of the concentrations of these [molds] in air breathed by the individual. The second step involves an evaluation, based on the published scientific literature, of the exposures necessary to produce the adverse effects associated with the [molds] to which the individuals may be exposed. These two evaluations are then combined in the final step of the risk assessment to provide an estimate of the likelihood that any of the harmful properties of any or all of the [molds] might have been expressed in the exposed individual.

*Id.* In his affidavit, Dr. Bernstein fails to set forth any of these findings with any specificity; however, considering the record, the Court concludes that Dr. Bernstein lacks any knowledge of the levels of exposure to mold required to manifest any symptoms. Furthermore his reliance on several articles, addressed in his deposition, is misplaced because those articles and others, which have become part of the record, reveal that there are no quantitative standards or guidelines for assessing whether the mold contamination in an area is acceptable or not. Dr. Bernstein's reliance on his anecdotal experience to form a conclusion as to specific causation is un-

8. In analyzing whether a particular level of exposure to mold caused the Roches' illness, Dr. Bernstein is considering principles in immunology. However, in the absence of other standards argued by the parties, the Court finds the toxicology methodology addressed in *Cavallo* instructive.

founded because his anecdotal experience is not based on the methods of science. Thus, Dr. Bernstein's inclusion of the various molds lacks scientific support and is suspect.

i. *Mold Evaluation*

The results of the test of the Roches' apartment, conducted by Potomac Environmental Testing Services ("PETS") using "wipe sampling," "bulk sampling," "Burkard air sampling," and "Anderson air sampling" form a building block in the first step of the analysis. From the bulk sampling, PETS found 3,920,000 colony forming units per gram (cfu/g) of Stachybotrys within the HVAC closet ceiling, 40,000 cfu/g of Cladosporium and 40,000 cfu/g of Penicillium. Inside a duct from the HVAC unit, PETS found 1,027,000 cfu/g of Penicillium and 156,000 cfu/g of Cladosporium. As a result of the Burkard air sampling, PETS found 1,056 spores per cubic meter (spores/$m^3$) of Stachybotrys in the living room—compared to 0 spores of Stachybotrys found in the outdoor patio. They also found 308 spores/$m^3$ of Cladosporium within the living room and 22 spores/$m^3$ in the outdoor patio. Using the Anderson Air Sampler, PETS found 627 colony forming units per cubic meter (cfu/$m^3$) of Stachybotrys within the living room and none in the outdoor patio. PETS also found 179 cfu/$m^3$ of Aspergillus in the living room and none in the outdoor patio. They further found 141 cfu/$m^3$ of Cladosporium within the living room and 237 cfu/$m^3$ in the outdoor patio. As a result of their analysis of the wipe-samples, PETS found 10,010 colony forming units per square inch (cfu/$in^2$) of Penicillium within the HVAC closet drain pan and 93,600 cfu/$in^2$ within the linen closet. PETS also found 31,200 cfu/$in^2$ of Aspergillus within the linen closet and 14,030 cfu/$in^2$ in the front bathroom—of which 2,070 cfu/$in^2$ were Aspergillus versicolor. Finally, PETS found 3,901 cfu/$in^2$ of Stachybotrys in the front bathroom.

ii. *Literature Review*

Dr. Bernstein lacks personal knowledge of what levels of exposure are considered toxic or dangerous to human health, or even what levels of exposure trigger allergic reactions. (Bernstein Dep. at 76:20–77:4.) Furthermore, Dr. Bernstein is not a toxicologist, nor has he received any training in toxicology. (*Id.* at 65:8–11.) Dr. Bernstein relies solely on published articles to form an opinion that exposure to the specific levels of Stachybotrys causes cognitive injuries, that Aspergillus causes both cognitive injuries as well as allergic reactions, and that Penicillium and Cladosporium cause allergic reactions. Although Dr. Bernstein finds support in the literature for his conclusion that Aspergillus, Cladosporium, Penicillium, and Stachybotrys can cause the Roches' symptomology, he fails to provide any scientifically valid basis to support his leap from these articles to his conclusions on specific causation.

As stated in his deposition testimony, Dr. Bernstein relied upon several articles and statements to form his opinions on proximate causation in this case. Dr. Bernstein references articles in the *Journal of Asthma* and in *Clinical Toxicology* for the proposition that Stachybotrys caused the Roches' cognitive injuries, such as chronic headaches, memory loss, and perhaps hypersensitivity to smells and that molds caused the Roches' allergies and respiratory illnesses. (*Id.* at 35:6–36:12.) In the article from the *Journal of Asthma*, the authors discuss several studies, from various locations, which have investigated the links between molds, specifically Stachybotrys, and health related symptoms. *See* Massoud Mahmoudi & M. Eric Gershwin, *Sick Building Syndrome, III., Sta-*

*chybotrys chartarum,* 37 Journal of Asthma 2, at 191–98 (2000). The authors note that the presence of fungi in a home does not imply illnesses; nonetheless, "fungi have been associated with human-related illnesses." *Id.* at 196. The authors, however, conclude that it is difficult to prove an association between Stachybotrys and other microorganisms and health-related symptoms because "[t]he respiratory symptoms as well as other complaints of the patients may be due to a combination of dampness, pollution such as dust, fumes and smoke, and prolonged exposure including inhalation of mycotoxins from S. chartarum and/or other microorganisms." *Id.* at 197. They also suggest further detailed case studies and that "a suitable animal model should be found for testing." *Id.* The authors do not discuss whether a particular level of exposure has led to symptoms—they refer to general causation (which is not at issue in this case). The authors discuss specific levels of exposure in their discussion of a link between Stachybotrys and pulmonary hemorrhage / hemosiderosis in infants. This injury, however, is not at issue in this case, and Dr. Bernstein does not address it in his findings. Thus, the Journal of Asthma article does not provide any information which is helpful in the second step of the toxicology methodology.

Dr. Bernstein also references an article from *Clinical Toxicology. See* Eckardt Johanning, *Stachybotrys Revisited,* 36 Clinical Toxicology 6, at 629–31 (1998). The letter from Dr. Johanning to the editor addresses a previous study which included a control group of twenty-one individuals with similar demographics and environmental history, except for employment in the problem building and exposure to Stachybotrys fungi. *Id.* at 629. The study was initiated after several employees reported to the Mount Sinai Medical Center with medical problems. *Id.* Several of these employees, either through direct physical contact with moldy materials or by working in the locations with the highest airborne Stachybotrys levels (from 116 to over 2,000 cfu), were diagnosed with chronic laryngitis, sinusitis, bronchitis, asthma, and allergy. *Id.* Although this link is significant, the author concludes that "[c]hronic, low to moderate level inhalation exposure has not been systematically studied and documented in the past." *Id.* at 630. He also states that indoor environmental exposures fluctuate inhalation doses over time, that there is a "lack of simple, reliable exposure indicator or a Stachybotrys disease biomarker," and that isolating exposure to Stachybotrys is difficult because Stachybotrys is generally found with other molds such as Penicillium and Aspergillus, of which there are several hundred species with very different properties, mycotoxins, and allergenic potency. *Id.* Thus, the author acknowledges that no definable standard exists for determining whether an individual will react to exposure to various levels of different molds. This article does not provide Dr. Bernstein with any scientific basis as to specific causation—at best the article addresses only general causation.

At his deposition, Defendants questioned Dr. Bernstein on two articles that they forwarded to him prior to the deposition: an article from the National Center for Environmental Health ("NCEH") for the Center for Disease Control and Prevention ("CDC") and an article from the American College of Occupational and Environmental Medicine ("ACOEM"). The NCEH article, *What Are Molds ...,* provides general information about various molds and their effects on human health. (*See* Bernstein Dep., Ex. 7.) The article states that some people are sensitive to molds, and that for those people, exposure to mold

"can cause symptoms such as nasal stuffiness, eye irritation, or wheezing." *Id.* The article, however, summarizes that "Stachybotrys chartarum and other molds may cause health symptoms that are nonspecific. At present there is no test that proves an association between Stachybotrys chartarum and particular health symptoms." *Id.* Thus, this article, like the previous ones discussed herein, provides information only as to general causation—not specific causation. Nor does the article provide any data that medical doctors may use to determine whether their patients are suffering from exposure to molds or whether they are suffering from their allergies to pollen.

The article by the ACOEM also addresses general causation only and further undermines Dr. Bernstein's conclusions as to Plaintiffs' suffering from sick building syndrome. Bryan D. Hardin, *et al., Adverse Human Health Effects Associated with Molds in the Indoor Environment,* ACOEM Evidence-based Statement of October 27, 2002. That articles provides:

> Residential or office fungal exposures may be a substantial factor in an individual's allergic airway disease depending on the subject's profile of allergic sensitivity and the levels of indoor exposures. Individuals with this type of mold allergy are "atopic" individuals, ie., have allergic asthma, allergic rhinitis [hay fever], or atopic dermatitis and manifest allergic (IgE) antibodies to a wide range of environmental proteins among which molds are only one participant. These individuals generally will have allergic reactivity against other important indoor and outdoor allergens such as animal dander, dust mites, and weed, tree, and grass pollens.

*Id.* at 2. The article also explains that "sick-building" syndrome is a poorly defined set of symptoms which are attributed to occupancy in a building; however, "despite a voluminous literature on the subject, the causal connection remains weak and unproven, particularly with respect to causation by mycotoxins." *Id.* at 4, 6. The article concludes that, despite the ability of Stachybotrys to produce mycotoxins, the multiple studies on the issue have failed to establish a connection between exposure to Stachybotrys and adverse human health reactions. *Id.* at 6. Thus, this article provides no scientific basis for specific causation: it provides no link between exposure to specific levels of specific molds and subsequent illnesses.

The article's statement that the presence of a toxigenic species of mold does not necessarily indicate that mycotoxins are also present[9], provides a basis for questioning whether mycotoxins existed in the Roches' apartment. *See id.* at 4. This is significant because the P.K. Jarvis report on the cellulose extracted from the Roches' apartment showed the presence of mycotoxins on the cellulose sample. However, the test was performed at a laboratory, not at the Roches' apartment; thus, the

**9.** The article explains:

> Mycotoxins are "secondary metabolites" of fungi, which is to say mycotoxins are not required for the growth and survival of the fungal species ("toxigenic species") that are capable of producing them. The amount (if any) and type of mycotoxin produced is dependent on a complex and poorly understood interaction of factors that probably include nutrition, growth substrate, moisture, temperature, maturity of the fungal colony, and competition from other microorganisms. Additionally, even under the same conditions of growth, the profile and quantity of mycotoxins produced by toxigenic species can vary widely from one isolate to another. Thus, it does not necessarily follow from the mere presence of a toxigenic species that mycotoxins are also present.

*Id.* at 4.

test results, by themselves, are inconclusive as to whether the Stachybotrys present at the Roches' apartment was actually producing mycotoxins while the Roches lived in the apartment. This further undermines Dr. Bernstein's conclusions.

Although not directly relied upon by Dr. Bernstein at his deposition testimony or in his affidavit, Plaintiffs cite to several articles to support their theory of general causation. As stated previously, general causation is not at issue in this case; however, the articles Plaintiffs reference are significant because they state that there are no established standards to determine whether a particular mold caused a particular injury in an individual—no standards for determining specific causation. Plaintiffs reference the New York City Department of Health and Mental Hygienc's *Guidelines on Assessment and Remediation of Fungi in Indoor Environments* (the "*Guidelines*") for the proposition that molds can cause asthma, hypersensitivity, pneumonitis, allergic rhinitis, dermatitis, runny nose, eye irritation, cough, and congestion, and that "hypersensitivity pneumonitis may occur after repeated exposures to an allergen and can result in permanent lung damage." (Pls.' Mem. Opp'n at 12.) Although Dr. Bernstein has not diagnosed either Mr. Roche or Mrs. Roche with hypersensitivity pneumonitis, the *Guidelines* support Plaintiffs' theory of general causation; however, the *Guidelines* make clear that whether a particular individual develops symptoms when exposed to molds depends on a variety of factors: "the nature of the fungal material (e.g., allergenic, toxic, or infectious), the amount of exposure, and the susceptibility of exposed persons. Susceptibility varies with the genetic predisposition (e.g., allergic reactions do not always occur in all individuals), age, state of health, and concurrent exposures." New York City Department of Health and Mental Hygiene, *Guidelines on Assessment and Remediation of Fungi in Indoor Environments,* at ¶ 1.1, *available at http://ww.ci.nyc.ny.us/html/doh/html/epi/moldrptl.html.* "For these reasons, and because measurements of exposure are not standardized and biological markers of exposure to fungi are largely unknown, it is not possible to determine 'safe' or 'unsafe' levels of exposure for people in general." *Id.* The *Guidelines* add that there are no currently available clinical tests to determine the source, place, or time of exposure to fungi or their products. *Id.* at ¶ 1.2. Furthermore, antibody testing is of limited value since individuals are exposed to molds in both outdoor and indoor environments. *Id.*

Another publication by the CDC is a statement by the Chief of the Air Pollution and Respiratory Health Branch for the National Center for Environmental Health at the CDC. Stephen C. Redd, M.D., *State of the Science on Molds and Human Health,* Statement for the Record Before the Subcommittee on Oversight and Investigations and Housing and Community Opportunity, Committee on Financial Services, United States House of Representatives (July 18, 2002). In his statement, Dr. Redd acknowledges that there are many unresolved questions about mold exposures but that "exposures to high levels of molds causes some illnesses in susceptible people." *Id.* at 1–4. Dr. Redd states that the Institute of Medicine ("IOM") has linked airborne molds to allergic rhinitis/conjunctivitis, allergic asthma, and hypersensitivity pneumonitis and to exacerbations of asthma. *Id.* at 3. Dr. Redd, however, notes that:

> There are no accepted standards for mold sampling in indoor environments or for analyzing and interpreting the data in terms of human health. Molds are ubiquitous in the environment, and

can be found almost anywhere samples are taken. It is not known, however, what quantity of mold is acceptable in indoor environments with respect to health. Because of difficulties related to sampling for mold, most studies have tended to be based primarily on baseline environmental data rather than human dose-response data. For these reasons, and because individuals have different sensitivities to molds, setting standards and guidelines for indoor mold exposure levels is difficult and may not be practical.

*Id.* at 9–10.

Thus, it is undeniable or clear that molds can have adverse health effects on a person; it is also evident from the literature, however, that there are no established standards to determine whether exposure to particular levels of particular molds will trigger an adverse health reaction.[10] In an attempt to correlate a specific level of mold found in the apartment with a government standard, Plaintiffs cite to the Occupational Safety and Health Agency ("OSHA") standard that indicates potential contamination in the air when there are 1,000 viable colony-forming units in a cubic meter of air. Plaintiffs cite the OSHA standard as 1,000 *particles per cubic meter;* however the correct standard is 1,000 *colony-forming units in a cubic meter of air.* (Defs.' Mem. Reply, Ex. 1.) (emphasis added). Comparing the Mold Investigation Report and the OSHA standard, the Court finds that no measurement exceeds the OSHA standard; therefore, there is no objective evidence of potential contamination.[11] The Court concludes that

**10.** *See* Pamela J. Davis, *Molds, Toxic Molds, and Indoor Air Quality,* California Research Board Note Vol. 8, No. 1 at 5–6 (March 2001) (stating that it is impossible to set exposure limits for molds that can be applied generally because of the variance in individual sensitivities and because of the vast array of molds (over 100,000) and explaining that

> A comprehensive review of available literature relating to the health effects of mold performed by the Federal–Provincial Working Group on Mycology Air Quality in Public Buildings (a Canadian Government sponsored group) showed that [several population-based studies] have consistently detected an association between respiratory symptoms and home dampness and mould (sic) growth, but causality in these studies has not been established.

(internal citations omitted)); N. Carlson, *Mycological Aspects of Indoor Air Quality, http://www.dehs.umn.edu/iaq/ fungus/mycoglos.html* *1–*2 (Department of Environmental Health & Safety, University of Minnesota Apr. 29, 1996) (stating that there are no strict numerical guidelines for assessing whether an area is contaminated by mold, and that there are no standards in establishing a link between environmental exposure and the results of an allergy test because "[t]he antigenic material produced by a fungus or a particular genus will vary according to species or a strain within the species and vary with the source of nutrition for the organism"); The American Industrial Hygiene Association, *The Facts About Mold: For the Professional* at *2–*3, *available at http://www.aiha.org/GovernmentAffairs-PR/ html/mold-professional.htm* (May 28, 2002) (stating that although dampness in buildings has been associated with respiratory problems, the extent to which mold contributes to this problem is unknown; explaining that there is an almost complete lack of information on specific human responses to well-defined exposures to mold; and concluding that "[u]ntil microbiological methods for demonstrating mold concentrations in the environment are standardized and reproducible, epidemiological studies necessary to determine dose-response can only suggest association, not cause and effect, with respect to mold exposures and health effects"); Berlin D. Nelson, *Stachybotrys chartarum: The Toxic Indoor Mold* at *7, *available at http://www.apsnet.org/online/ feature/stachybotrys* (American Phytopathological Society Nov. 2001) (stating that scientists lack information about the relationship between exposure to bioaerosols of Stachybotrys, in quantity and duration of exposure, and the effects on human health).

**11.** Notably, PETS found 1,056 *spores* per cubic meter of Stachybotrys in the living room—

Dr. Bernstein offers no documented basis for linking the specific levels of mold found in the apartment to the Roches' symptomology.

iii. *Estimate of the Harm*

For the third step in the analysis, Dr. Bernstein combines the Mold Investigation Report, the literature, his anecdotal experience with patients that have been allegedly exposed to Stachybotrys, and his experience with patients that have suffered from "sick-building" syndrome to arrive at his conclusion on specific causation. (Bernstein Dep. at 92:13–19, 101:18–102:7.) Although PETS conducted the testing within the apartment, they provided no opinion as to how the various levels of exposure related to human health. The PETS report stated:

> While the severity of exposure is difficult to estimate, and no direct link between the occupants' health complaints and their exposure can be shown through the methods of this investigation, consideration should be given to the fact that the occupants' health complaints . . . are all consistent with well-defined case studies of chronic trichothecene intoxication.

(Mold Investigation Report at 6.) Therefore, the Mold Investigation Report provides nothing more than the levels of molds found in the apartment—the Report does not provide Dr. Bernstein with any findings or conclusions as to the severity of the exposure. Moreover, as discussed previously, Dr. Bernstein's reliance on the literature to establish specific causation is misplaced. And, as discussed below, his consideration of anecdotal experiences does not support his opinion on specific causation. Thus, Dr. Bernstein fails to satisfy the third step in the methodology, and his inclusion of the various molds as suspected causes of the Roches' symptoms is not scientifically valid.

Dr. Bernstein testified that he had seen several patients allegedly exposed to Stachybotrys, and that, based on his anecdotal experience, he concluded that the Roches' symptoms were caused by their exposure to Stachybotrys. (*Id.* at 34:13–17, 36:8–20, 45:12–46:1, 54:9–14, 74:19–76:18.) However, Dr. Bernstein fails to explain how the specific exposure to the molds in the Westfield Village are similar in quantity and duration to any of the patients he has examined who have been exposed to Stachybotrys. Dr. Bernstein's position is further undermined by his own testimony; Dr. Bernstein explains his experience with other patients:

> For example, I'm seeing one patient, she has Stachybotrys in her basement, she's completely unaffected has no symptoms, she and her husband have no symptoms at all; in that situation there's no ventilation in the house; in other words, they have baseboard heat, so I think the fact that there's really not much circulation there as we alluded to by Mr. Dean earlier, is the reason why they may not be having symptoms; I'm seeing a large group of patients through another situation, where they were involved in a building that had significant Stachybotrys according to the industrial hygienist; . . . the ventilation is consistent, it's

not *colony forming units.* (Mold Investigation Report at 5.) The measurements taken through bulk-sampling were reported as *colony forming units per gram,* not *per cubic meter.* (*Id.* at 5.) PETS reported the Anderson air sampling results in terms of *colony forming units per cubic meter;* however, none of those measurements exceeded the OSHA standard advanced by the Plaintiffs. (*Id.*) Also, PETS reported the wipe-sampling results in terms of *colony forming units per square inch,* not per *cubic meter.* (*Id.*) Thus, absent a direct comparison or a conversion table, none of these measurements exceed the OSHA standard.

contained in the building, they had some people that were mildly ill, the what happened was they tried to remove the Stachybotrys, ...; they aerosolized everything, about 25 people became very ill in the building, and some of them—about 5 or 6 of them with the symptoms similar to the Roche's [sic]; so in that situation I think it's a combination of how much mold is present, what are the mycotoxin levels and what's the ventilation system ...

(*Id.* at 75:10–76:18.) Dr. Bernstein fails to address the specific levels of exposure and how these levels are tied to his patients' suffering from various illnesses. Dr. Bernstein speculates that the ventilation system makes a difference on whether an individual becomes sick from exposure to Stachybotrys; however, this is merely his hypothesis—not a scientifically supportable conclusion. He further fails to explain why some individuals in the building scenario became mildly ill while others were not ill at all, where the building had constant ventilation. He also does not address the levels of exposure in that case—he merely states that the building had "significant" amounts of Stachybotrys. Dr. Bernstein provides no link between the Roches' specific exposure to molds and his experiences with other patients; he advances merely scientifically unsupported theories—speculations. Dr. Bernstein's anecdotal experience, while valuable to an ongoing study or to research, is not helpful in this instance because it does not support specific causation.[12]

In summary, Dr. Bernstein provides no scientific basis to rule in, as part of a differential diagnosis, the molds found in the Westfield Village apartment. As a result of the skin endpoint titration tests, Dr. Bernstein determined that Mr. Roche was not allergic to Aspergillus, Cladosporium, or Penicillium; thus, these molds cannot be ruled in to the analysis for Mr. Roche's symptomology. Mrs. Roche's skin endpoint titration test revealed that she was allergic to those three molds; therefore, the three molds may be ruled in as the suspected causes for her allergy and asthma symptoms. However, the literature relied upon by Dr. Bernstein fails to establish a link between a particular level of exposure and her symptoms; Dr. Bernstein takes a leap of faith and concludes that because general causation exists, then specific causation must also exist, without regard to the levels of exposure. There is no support in the scientific literature for this causation theory. With respect to the Stachybotrys, Dr. Bernstein conducted no testing, dismissed the RAS test as inconclusive, and ruled in the mold based on the literature and on his anecdotal experience. As with the other molds, there is ample evidence, within the literature, that Dr. Bernstein's inclusion of Stachybotrys is rejected by the scientific community as to specific causation. Accordingly, the Court finds that Dr. Bernstein failed to follow the accepted the toxicology methodology in ruling in the various molds as potential causes of the Roches' symptomology.

d. *Ruling out Other Allergens*

Assuming, arguendo, that Dr. Bernstein properly ruled in the various molds found in the apartment, he fails to rule out any of the other allergens to which the Roches were sensitive. The medical record and the tests performed by Dr. Bernstein suggest that the Roches were allergic to mul-

**12.** "Where symptoms may be the subject of a variety of causes, it is insufficient for an expert to opine as to the cause of a symptom without some *scientific basis* other than his assertion of general experience." *Cali v. Danek Medical, Inc.,* 24 F.Supp.2d 941, 951 (W.D.Wis.1998) (emphasis added).

tiple allergens. Therefore, as part of the second portion of the differential diagnosis methodology, Dr. Bernstein must exclude the remaining allergens, or at least minimize the probability of the contribution of the remaining allergens to the Roches' symptomology. *See Cavallo,* 892 F.Supp. at 771.

At his deposition, on February 26, 2003, Dr. Bernstein stated that there were multiple explanations for the Roches' flu-like symptoms: "their allergic respiratory symptoms are multi-factorial of which mold may have been a contributing factor, ...." (Bernstein Dep. at 33:4–6.) Dr. Bernstein admitted, through questioning by Defense counsel, that he was not able to isolate the cause of the Roches' allergic reactions:

> Q. When a person has lots of allergies, and then let's say, they're allergic to 15 to 20 things on the sheet that you have in front of you, and they come in with a complaint of nasal congestion; are you as an allergist able to tell which one of those things caused their nasal congestion?
>
> A. No.
>
> Q. Pardon me.
>
> A. No.
>
> Q. So there's (sic) many possibilities that you—You know their (sic) allergic to a lot of things, buy you just could never tell which one actually is causing the problem; correct?
>
> A. That's correct.

(*Id.* at 64:1–12.) In response to a question by Plaintiffs' attorney, Dr. Bernstein stated that

> There are a number of explanations which could explain the flu-like symptoms [the Roches] had, they could have had a micoplasma infection, they could have had an Epstein–Barr virus infection, ..., it could be related to allergic symptoms and chronic mold exposure, it may related to mycotoxic symptoms; it is one of the explanations, I don't have—since not having all of their data at this point, and know all the workup that was done at that time; in other words, if I had seen them at that time, I would have done a workup to make sure that—The diagnosis of making this conclusion that you're asking is one of exclusion; therefore, we need to make sure that we need to exclude; retrospectively it is certainly a possible explanation for the patients' symptoms.

(*Id.* at 107:18–108:10.) On re-direct, Dr. Bernstein once again acknowledges that he had not excluded any of the other possible causes at the time of the deposition. (*Id.* at 133:3–15.) Dr. Bernstein's testimony demonstrates that he believed there were other causes for the Roches' flu-like symptoms besides mold; he was, at that point, unable to exclude the other allergens.

Dr. Bernstein added that Mr. Roche smoked which is a non-specific irritant making allergy symptoms worse; he instructed Mr. Roche to quit smoking. (*Id.* at 20:15–20.) He also directed the Plaintiffs to get rid of their cat because they were both allergic to cats. (*Id.* Ex. 1.) Dr. Bernstein's position is further complicated by the fact that he examined the Roches nine months after their alleged exposure to the molds in the apartment.

Plaintiffs contend that Dr. Bernstein did not have all the information necessary to exclude all of the other allergens from his differential diagnosis. Even accepting this as true, Dr. Bernstein's affidavit, submitted after he received all of the information and was able to digest the medical records and test results, fails to set forth, in any detail, the factors that supported Dr. Bernstein's ruling out the remaining allergens and leaving the molds found in the

apartment as the sole cause of the Roches' symptomology. Dr. Bernstein's testimony is similar to that of the internist in *Ballinger v. Atkins,* 947 F.Supp. 925 (E.D.Va. 1996). In *Ballinger,* the court barred the internist's testimony on *Daubert* grounds because the expert had conceded that there were multiple causes for the plaintiff's memory loss besides the brain damage: "[the internist] includes among those other possible causes sugar intolerance, latent hypoglycemia, psychiatric disorder, bowel disorder or even an intestinal parasite." 947 F.Supp. at 928. Similar to the situation in *Ballinger,* Plaintiffs in this case are allergic to multiple allergens beyond the molds found in the apartment—they are even allergic to their own cat. Dr. Bernstein's differential diagnosis fails to account for these alternate explanations, and the Court finds that his testimony is suspect and unsupported by science.

In addition to failing to exclude obvious alternate causes, Dr. Bernstein fails to set forth any of his findings at his deposition with a reasonable degree of medical certainty. Plaintiffs maintain that Dr. Bernstein's affidavit sets forth his conclusions with the requisite "reasonable degree of medical certainty." However, at his deposition, Dr. Bernstein testified that he lacked any knowledge as to what a "reasonable degree of medical certainty" entailed. (Bernstein Dep. at 53:15–56:9., 89:7–90:2.) In *Ballinger,* the court noted that the internist was unable to present any opinion "with a reasonable degree of certainty." *Id.* The Court finds the present situation similar to that in *Ballinger:* Dr. Bernstein fails to rule out obvious and commonly found allergens, and he fails to set forth any findings with the requisite "reasonable degree of medical certainty." Dr. Bernstein's differential diagnosis is unsupported by the record and is scientifically invalid.

e. *Summary*

While the methodology of differential diagnosis is scientifically valid, in this instance, Dr. Bernstein has failed to faithfully apply the methodology to the facts. First, Dr. Bernstein does not rule in Aspergillus, Cladosporium, and Penicillium as to Mr. Roche because he was not allergic to these molds. Second, although Mrs. Roche was allergic to Aspergillus, Cladosporium, and Penicillium, Dr. Bernstein's reliance on the literature addressing general causation is misplaced because the literature provides no scientific support for specific causation. Third, Dr. Bernstein did not test the Roches for sensitivity to Stachybotrys, and he dismisses the Stachybotrys test the Roches had previously undergone as inconclusive. Fourth, the literature upon which he relies provides no support for his leap from general causation to specific causation given the specific molds, the specific levels of exposure, and the Roches' medical history. Also, his anecdotal experience is insufficient to support specific causation in light of the authoritative conflicting scientific literature. Fifth, he fails to properly rule out other allergens and to provide any opinion, at his deposition, with the requisite "reasonable degree of medical certainty."

Dr. Bernstein concludes, in his affidavit, that the Roches became sensitized to molds through their exposure. (Bernstein Aff. at ¶ 6.) His conclusion, however, is belied by the deposition record. During his deposition, Dr. Bernstein testified that it was possible for the Roches to have become sensitized to molds which would contribute to their allergic symptoms; he acknowledged, however, that in order to determine sensitization he would have had to test the Roches for allergic reactions to molds prior to their moving into the apartment. (Bernstein Dep. at 33:7–17.) And, he fails to provide any basis in his affidavit

that supports his conclusion of sensitization. Thus, his conclusion as to sensitization is untenable.

In his affidavit, Dr. Bernstein states that he received blood test results, CAT scan results, MRI results, and X-rays on both Mr. and Mrs. Roche. (Bernstein Aff. at ¶ 2.) However, he provides no explanation on how his consideration of these records contributed to his determination that the Roches' symptoms came about as a result of their exposure to molds. The Court concludes that there is no support in the medical record or in the scientific literature for Dr. Bernstein's conclusion as to specific causation: Dr. Bernstein has unjustifiably extrapolated from the medical record and the scientific literature his unfounded conclusion [13] and has failed to account for obvious alternate explanations.[14]

3. **Temporal Proximity as the Primary Theory for Proximate Causation**

It is clear that Dr. Bernstein does not follow a differential diagnosis methodology in formulating his opinion on proximate causation in this case. Dr. Bernstein relies primarily upon the temporal relation of the Roches' exposure to the alleged toxic molds to the onset and worsening of their physical problems to reach his opinion on proximate causation. (Bernstein Aff. ¶ 6.) He states that Mr. and Mrs. Roche were asymptomatic prior to moving into the Westfield Village apartment and that "their symptoms were caused by their exposure to molds, and that they became sensitized to molds and developed allergies to molds as a result of living in a contaminated apartment." (*Id.*) The Court finds that Dr. Bernstein's primary reliance is neither supported by the record, nor does it meet the *Daubert* standards.

The record reveals that Mrs. Roche was not asymptomatic prior to her arrival at the apartment. Mrs. Roche suffered from asthma since she was child. (Bernstein Dep. at 31:1–20.) Mrs. Roche visited the emergency room on several occasions complaining of flu-like symptoms before she moved into the apartment: March 4, 2001 (bronchitis), October 14, 1999 (sinusitis), August 26, 1999 (pharangitis), and July 6, 1999 (sinusitis). The Roches moved into the Westfield Village apartment on April 4, 2001. Thus, one month prior to moving into the apartment, Mrs. Roche had suffered from bronchitis—this can hardly be construed as "asymptomatic." In his opinion, Dr. Bernstein fails to provide any explanation as to how he dismisses Mrs. Roche's medical history and concludes that she was asymptomatic prior to April 2001. Dr. Bernstein provides no evidence or testimony as to how exposure to the molds made Mrs. Roche's asthma worse. In addition, he examined the Roches, for the first time, nine months after they had moved out of the apartment. Dr. Bernstein's conclusion that Mrs. Roche was asymptomatic prior to April 2001 is scientifically untenable in light of the record.

An opinion based primarily, if not solely, on temporal proximity does not meet *Daubert* standards. *See Cavallo,* 892 F.Supp. 756. In *Cavallo,* the court opined that "[a]t bottom, [the expert's] opinion is founded primarily on the temporal connection between the spill and the development of Ms. Cavallo's symptoms, as well as on his subjective, unverified, belief that AvJet can cause the types of injuries from which Ms. Cavallo suffers. This is not the method of science." 892 F.Supp. at 773; *see also Schmaltz,* 878 F.Supp. at 1122 ("it is well settled that a causation opinion based

13. *See* note 2, *supra.*

14. *See* note 3, *supra.*

solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Rule] 702"); *In re Breast Implant Litig.,* 11 F.Supp.2d 1217, 1238–39 (D.Colo.1998) (discussing how temporal relationship itself did not provide evidence of causation); *In re Swine Flu Immunization Prod. Liab. Litig.,* 533 F.Supp. 567, 567 (D.Colo.1980) (same); *In re Agent Orange Prod. Liab. Litig.,* 611 F.Supp. 1223, 1249 (E.D.N.Y.1985) (same).

Plaintiffs contend:

> In *Westberry,* [the defendant] claimed that the doctor had no scientific literature on which to rely to "rule in" talc as a possible basis for [plaintiff's] sinus condition, but the Court pointed out that it was undisputed that inhalation of high levels of talc irritates mucous membranes. 178 F.3d at 264. Likewise, in the Roche [sic] case it is undisputed that toxic mold causes the type of injuries that Plaintiffs suffered as set out in all of the Plaintiffs [sic] Memorandums [sic] herein [sic] from the EPA, CDC, etc. [sic] and the [D]efendants' own mold policies. "Further, although Dr. Isenhower did not point to [the plaintiff's] exposure to a specific level of airborne talc, there was evidence of substantial exposure." 178 F.3d at 264. Ginste testified that the [S]tachybotros [sic] levels were extremely elevated, causing the families to be told to immediately evacuate. (Ginste Dep. at 185–86.)

(Pls.' Surrebuttal Mem. at 11.) The Court, however, finds this argument inapposite in light of the facts of this case.

The expert in *Westberry* was the plaintiff's treating physician who had treated the plaintiff prior to his exposure to the talc in question. Also, the treating physician experimented with keeping the plaintiff out of work and noticed that his sinus condition would improve when not working and would worsen when he returned to work. 178 F.3d at 265. In this case, Dr. Bernstein examined and treated the Roches nine months after they left the apartment. He was not treating the patients either prior to their moving into the apartment, or while they lived in the apartment. The record does not demonstrate that Dr. Bernstein conducted the same type of testing that Dr. Isenhower performed in *Westberry.* Dr. Bernstein, in addition, fails to provide any scientific or medical explanation for his opinions. In *Westberry,* there was ample evidence before the court that the plaintiff had been exposed to severe concentrations of talc, which the court found to be a sinus irritant. Here, Mr. Ginste testified that the Roches had been exposed to "severe" mold concentrations; however, not all mold spores are allergens and not all molds produce mycotoxins. Plaintiffs did not proffer any reliable tests of the levels of mold spores present in the apartment. The Court finds notable and considerable differences between this case and *Westberry.* The Court concludes that Dr. Bernstein fails to provide an adequate methodology for his conclusions on proximate causation, and his primary reliance on temporal relationships is scientifically invalid.

## III. CONCLUSION

The Court concludes that Dr. Bernstein fails to "provide any evidence that a particular mold in the [apartment] had a greater possibility than cigarettes, dust mites, fibers, [cat dander], . . ., or any number of present environmental allergens, of causing health effects in [the Roches]." *Flores v. Allstate Texas Lloyd's Co.,* 229 F.Supp.2d 697, 702 (S.D.Tex.2002). The Court holds that Dr. Bernstein failed to adhere to the established methodology of differential diagnosis. His sole reliance on temporal relation is insufficient to satisfy the requirements of *Daubert* and its prog-

eny. Dr. Bernstein's testimony is scientifically invalid. Accordingly, the Court excludes Dr. Bernstein's testimony as to proximate causation for the Roches' injuries as inadmissible.

An appropriate order with respect to the motion to bar the testimony of Dr. Bernstein will issue forthwith.

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel.

### ORDER

THIS MATTER is before the Court on Defendants', Lincoln Property Company ("Lincoln") and the State of Wisconsin Investment Board ("SWIB"), motions to bar the testimony by Richard Bernstein, M.D. For the reasons stated in its Memorandum Opinion of July 25, 2003, the Court grants Defendants' motion to bar the testimony of Dr. Bernstein; therefore, it is hereby

ORDERED that Defendants, Lincoln Property Company's and the State of Wisconsin Investment Board's, Motions to Bar the Testimony of Richard Bernstein, M.D., are GRANTED.

The Clerk is directed to forward a copy of this Order to counsel.